UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DARRNELL LITTLE, | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| vs. | ) | No. 4:11-CV-1895-SPM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action brought pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration, denying Plaintiff Darrnell Little's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act").  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 18). For the reasons stated below, the court reverses the decision of the Commissioner and remands for further proceedings consistent with this Memorandum Opinion.

## FACTUAL BACKGROUND[1]

Plaintiff is a 28-year-old man alleging disability due to paranoid schizophrenia and depression.  Plaintiff was first diagnosed with schizophrenia in late 2007, at the age of 23. Although Plaintiff was first diagnosed at 23, the record reflects that he had a history of paranoia dating back to age 16.  At that time, Plaintiff brought a knife to school to defend himself because he thought other kids were after him.  In June 2004, when he was 19, Plaintiff sought treatment

---

[1] The following is not intended to be an exhaustive recitation of all of the evidence contained in the administrative record.  Rather, it is a summary of the evidence relevant to the issues raised in the appeal.

with the Metropolitan St. Louis Psychiatric Center ("MPC") for anxiety and depression.  The records from that visit suggest that Plaintiff's symptoms at the time were triggered by situational stressors, including among other things his inability to financially care for his two-year-old daughter.

### *Plaintiff's Initial Diagnoses and Treatment (2007-2008)*

Three years after his initial visit to MPC, on November 21, 2007, Plaintiff's mother took him back to the MPC.  According to the screening/admission notes, his mother indicated that he had been "bathing excessively and wearing a mask over his mouth"; had been crying and laughing out loud for no reason; was very paranoid; believed he could read people's minds; and had called the police because he believed he was being monitored.  It was noted that his pathology was steadily progressing.  (Tr. 346-348).

Plaintiff stated he did not know why his mother had brought him in but admitted to being obsessed with having germs on him and to having crying spells.  He acknowledged his belief that people are listening in on what he is saying.  He denied any psychosis but stated that it was hard for him to concentrate because "there are too many people around."  (Tr. 348).  The MPC determined Plaintiff would benefit from admission and transferred him to Barnes-Jewish Hospital because the MPC hospital was on diversion at the time.

Treatment notes from Barnes-Jewish Hospital largely corroborate the initial intake notes from MPC:

> [Plaintiff] ha[d] been talking with himself and [Mom] found him recently home in the bathtub in the dark.  [Plaintiff] report[ed] that he had read a story on the internet stating that sitting in the bathtub in the dark provides a different experience.  [Mom] [thought] that [Plaintiff] ha[d] been carrying a knife for the last several weeks… [Plaintiff] has no friends.  He ha[d] recently lost three jobs because of his paranoia.  He state[d] that he can read people's minds but he doesn't want to because it causes him to be emotionally hurt.  He often stares,

uses little speech.  He has lost interest in friends and activities, and this has worsened over the last three months.

(Tr. 225).

Plaintiff was hospitalized from November 21-30, 2007.  Treatment notes from his hospitalization revealed that toxicology was negative for all drugs.  At the time he was admitted, mental status examination revealed some psychomotor depression, reduction in spontaneous speech, and somewhat disorganized speech when asked about persecutory delusions.  Content of thought was positive for persecutory delusions.  Plaintiff did not report visual hallucination; however, it was unclear to the psychiatrist whether Plaintiff has visual hallucinations when he sees someone looking into his window.  Plaintiff's insight was noted to be poor because "he does not understand that he has schizophrenia."   In the "Assessment and Treatment Plan" the attending psychiatrist found "[h]e has significant loss of function and is unable to maintain a job or have friends, given his current symptoms."  (Tr. 226-27).

In the discharge summary, the attending psychiatrist wrote:

> The patent did well during the course of admission on 15300 until the afternoon of 11/23/07, when the patent became increasingly agitated.  He had started to pace the hallway, holding his head and attempted elopement from the 15300 service.  He had called home and hung up on his mother multiple times, stated that no one was home.  He would not speak to his physician or other nursing staff.  Because of his increased risk of elopement and danger to self and others he had to be transferred back to the 15500 for further management. . . .
>
> Throughout the course of admission, the patient had poor insight into his disease.  He felt that his medications were at times for his stomach, or smoking, or his body pain. . . . .  He was transferred back to the 15300 after becoming more compliant with this medications and noting increased sense of well being.  He did well during the course of the remainder of his admission on 15300 without any new events.

(Tr. 221).

During his hospital stay, Plaintiff's psychiatric condition eventually improved once hospital staff convinced him to take medication.  By discharge, he told doctors he thought his medications were "doing a good job."  Discharge diagnoses were: schizophrenia, paranoid type; back pain; and exotropia of the left eye.  At the time he was discharged, Plaintiff was referred to the Independence Center[2] and Midwest Psychiatry.  (Tr. 221-22).

Plaintiff began regular treatment with Midwest Psychiatry and Dr. Dan Mamah on December 14, 2007.  Between December 2007 and July 10, 2008, Plaintiff saw either Dr. Mamah or Nurse Practitioner Laura Romer at Midwest Psychiatry eight times.  During his initial intake, Plaintiff told Nurse Romer he thought his symptoms were related to his use of marijuana; as such, she found his insight and judgment to be "somewhat limited" and assessed a Global Assessment of Functioning (GAF) score of about 55.[3]  Nurse Romer urged Plaintiff to stay on his medications for the next 6-18 months and to abstain from marijuana use.  Plaintiff agreed to do so even though he said he was "not sure this is all going to work."  (Tr. 238-239).

In his initial visit with Dr. Mamah, Dr. Mamah found Plaintiff to be well dressed and groomed with regular speech and logical and sequential thought content.  However, he found Plaintiff's affect to be flat/tearful and rated his mood as a 6/10.  Plaintiff denied auditory and visual hallucinations, but Dr. Mamah indicated Plaintiff's insight/judgment was "poor" and

---

[2] Independence Center is a community center that provides programs and services that assist adults in the St. Louis metropolitan area with serious and persistent mental illnesses to live and work in the community, independently.  The Center's services include outpatient psychiatric care, which operates under the name Midwest Psychiatry.

[3] The Global Assessment of Functioning (GAF) scale is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994).  A GAF of 51-60 is defined as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).  *Id.*

assessed a GAF score of 55.  He noted that Plaintiff has poor insight into his illness and that Plaintiff indicated his intent to stop his medication because he did not need it and it was too sedative.  The doctor explained to Plaintiff the need for him to continue the medication and said he would adjust the dosage to help with the side effects.

During their second visit, in late December, Dr. Mamah noted that Plaintiff was taking his medications, as suggested.  He felt Plaintiff was doing better, although he still had auditory hallucinations at night.  The doctor found Plaintiff's mood was "better," his affect "blunted," and his insight/judgment "fair."  He increased Plaintiff's GAF score to 60,[4] noting that Plaintiff appeared to have improved insight and symptoms despite some psychosis and anxiety.  (Tr. 234).

Plaintiff continued to improve during the next visit in January 2008; he reported that he had no psychotic episodes and planned to take the GED.  Dr. Mamah found Plaintiff to be well dressed and groomed, with a regular rate and rhythm of speech, logical and sequential content of thought but a blunted affect, and "okay" mood.  The doctor indicated that Plaintiff "appears to be improving"; that his "insight has improved"; and that he appeared motivated.  He assessed a GAF score of 65[5] and noted that he would try to simplify Plaintiff's medication regime.  (Tr. 233).

During the next visit on February 14, 2008, Plaintiff told Nurse Romer he was mad about his medication because it made him feel "tired" "slowed down" and gave him the "jitters;" he wanted "off" the medications.  He nevertheless reported that he was attending the Independence Center three times per week.  During that visit, Nurse Romer noted that Plaintiff was well

---

[4] *See* note 2, *supra.*
[5] A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV*, at 32.

dressed and groomed and that his thought content was logical and sequential, but that Plaintiff's speech was slurred.  She found his affect "restricted" and lowered his GAF to 55.  She recommended supportive therapy to improve coping with ongoing stressors, but Plaintiff's response to that recommendation was "fair-poor."  (Tr. 232).

Plaintiff saw Nurse Romer again on February 28, 2008.  At that visit, he indicated that he felt less drowsy and slow and that his "speech sounds better."  He denied anxiousness and indicated he was attending the Center three times a week for GED class.  He denied psychiatric symptoms, and that the nurse noted that he "claims to be taking his meds even though he doesn't think he needs to."  Nurse Romer found Plaintiff to be well dressed and groomed, with regular rate and rhythm of speech and logical and sequential thought.  She found his affect restricted and his mood okay.  Regarding his insight, she noted his belief that he did not need the meds.  His GAF score remained at 55.  (Tr. 231).

Plaintiff next saw Nurse Romer on April 16, 2008.  She noted he had missed "multiple appointments" but that in the interim he had started temporary employment as a janitor.  She noted Plaintiff was well dressed and groomed but was wearing multiple layers although it was 70 degrees outside.  His affect was "restricted," but his mood was stable and his insight and judgment were "fair."  His GAF remained at 55, and she continued him on the same medications. (Tr. 230).

Plaintiff saw Dr. Mamah on June 10, 2008.  He stated that he was doing well, without symptoms or psychosis.  Dr. Mamah noted Plaintiff was well dressed and groomed, his speech was regular, and his thought content was logical and sequential.  He found Plaintiff's affect slightly blunted, but otherwise he was normal.  Dr. Mamah noted he was "doing relatively well" and continued him on his medications.  (Tr. 229).

Plaintiff's last visit at Midwest Psychiatry was with Nurse Romer on July 10, 2008.  At that visit, he indicated that he was working through Community Alternatives and studying for his GED test.  He indicated that he was making great progress in this GED class.  Nurse Romer found him to be well dressed and groomed, with regular speech and logical and sequential thought content.  She found his mood "alright" and his insight/judgment "fair."  She found his affect restricted.  She continued his GAF as 55 and indicated he needed to follow up with Dr. Mamah.  However, it does not appear he ever followed up with the doctor.  (Tr. 228).

On December 27, 2007, Plaintiff started receiving services from Independence Center, including the above-referenced GED classes.  On February 13, 2009, Independence Center placed Plaintiff on "Inactive Status" because he had stopped attending "despite several outreach efforts."  The Center noted "he is welcome to return and his goals remain in progress."  (Tr. 266).

Plaintiff was eventually discharged from Independence Center on January 31, 2009.  The Discharge Summary indicated that at the time, Plaintiff was "self-employed during [sic] computer repair out of his home."  The social worker who prepared the discharge summary noted that at "[t]he end of the summer of 2008, [Plaintiff] started repairing computers from his home. He is doing well with this enterprise."  The reason given for discharge was that "[Plaintiff] decided that he did not need community support service as he had met his goals.  At the time of his discharge, he had not been taking his medications for about four months and did not notice a difference in the way he felt.  Additionally, his father did not notice any change in [Plaintiff's] behavior.  [Plaintiff] related that he was doing fine with his self-employment and believed he could get his GED on his own."  (Tr. 263).

7

*Plaintiff's Treatment in 2010*

About a year after being discharged from Independence Center, and more than a year after his last treatment with Midwest Psychiatry, on January 19, 2010, Plaintiff drove himself to the emergency room at Barnes Jewish Hospital, complaining that a bug had flown into his ear. He indicated that he may have washed it out and that he had also tried to remove it with tweezers. His physical examination was normal, and he was discharged home with instructions to follow up with BJC Behavioral Health South or BJC Hospital South. One month later, on February 16, 2010, Plaintiff drove himself to the emergency room at Barnes Jewish Hospital, reporting that he had schizophrenia and had not been taking his medications, but he left before being seen by a doctor (Tr. 270, 272, 276).

As detailed below, Plaintiff filed an application for Supplemental Security Income (SSI) on March 11, 2010. After applying for benefits, Plaintiff continued to seek and receive treatment for his psychiatric symptoms. He saw Dr. Sanjeev Kamat at St. Louis Psychiatry Doctors Group three times between March 15, 2010 and April 30, 2010. At his first visit with Dr. Kamat, Plaintiff reported paranoia, he felt he "might know what other people are thinking about," he obsessed about being contaminated with dirt, and he was compulsive about washing. Dr. Kamat observed that Plaintiff's affect was restricted, that Plaintiff had flight of ideas and looseness of association and that Plaintiff was positive for paranoia, obsessions, and delusions. Dr. Kamat diagnosed chronic undifferentiated schizophrenia, major depressive disorder (MDD) and obsessive-compulsive disorder (OCD). (Tr. 283, 285-286). Plaintiff showed improvement over time after resuming his medication.

Plaintiff also received treatment at BJC Healthcare on June 4, July 13, and September 14 of 2010. The initial intake report at BJC reflects that "[Plaintiff] is still adjusting to the idea that

he has a mental illness (schizophrenia) and whether or not he wants to take medications." Plaintiff's symptoms met the criteria for diagnosis of schizophrenia, paranoid type.  The report also found Plaintiff has "difficulty avoiding or resolving self-destructive impulses" which "sometimes reduces his safety."  "He continually dismisses others warnings and demonstrates poor judgment about risk."  He has difficulty expressing his needs.  His speech is disorganized and difficult to follow, often jumping from one topic or idea to another.  (Tr. 358-359).  The treatment notes from these visits to BJC in 2010 show that Plaintiff's symptoms were exacerbated following a period of non-compliance but improved once Plaintiff resumed the medications.[6]

### *Medical Opinion Evidence*

After Plaintiff filed for benefits, State agency psychologist Ricardo Moreno, PsyD, completed a Psychiatric Review Technique Form ("PRTF") dated April 23, 2010.  In the PRTF, Dr. Moreno found Plaintiff had the medically determinable impairments of paranoid schizophrenia, MDD (major depression disorder), and OCD.  Based on his review of Plaintiff's medical records, Dr. Moreno found that, as a result of Plaintiff's mental disorders, Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended duration.  Dr. Moreno noted that the "[t]otality of the medical evidence shows that with meds he is able to focus on task, study and take care of

---

[6] The court also reviewed and considered treatment notes and a Mental RFC Questionnaire dated July 26, 2011, from Afaf El-Mashhady, M.D., which Plaintiff submitted to the Appeals Council after the ALJ rendered his opinion.  (Tr. 367-377).  As the Commissioner points out, Dr. Mashhady's records are not directly relevant to the issue raised in this appeal, but certain aspects of Dr. Mashhady's records could be viewed as supporting a finding that Plaintiff is not disabled.  However, consistent with findings of other clinicians, Dr. Mashhady determination that Plaintiff "could be stabilized" appeared to be contingent on his taking medication and participating in therapy. (Tr. 374).

his daughter.  His third party reports that he reads almost every day.  He can drive . . . goes out alone and uses public transportation; can make simple meals and HH chores.  His report of symptoms is credible."  Dr. Moreno found Plaintiff is "capable of at least simple work such as his past work as a janitor." (Tr. 288-99).

Dr. Moreno also completed a Mental Residual Functional Capacity Assessment dated April 23, 2010, wherein he opined Plaintiff suffers from a number of moderate limitations in work-related abilities, including, among others, the ability to remember locations and work-like procedures; understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 300-01).

At the hearing before the ALJ, Vocational Expert Brenda Young testified that an individual with Plaintiff's RFC, as defined by the ALJ, could perform Plaintiff's past janitorial work.  Ms. Young also testified that an individual with the number of moderate limitations identified by Dr. Moreno "would have difficulty maintaining employment," particularly if those limitations were all operating at the same time.  (Tr. 55-56, 58).

*Plaintiff's Education and Employment History*

Plaintiff dropped out of school in the tenth grade.  Despite studying for his GED in 2008/2009, Plaintiff was ultimately unsuccessful in obtaining it.  He last worked in September 2008, for a deli.  He was fired, he claims, due to excessive talking.  Before that, he held a variety of low paying jobs for brief intervals, including working as a janitor, working as an airline baggage handler, working in data entry (related to baggage handling), and assisting a disabled cousin with daily living activities.  Plaintiff cited excessive tardiness as the primary reason he lost past jobs, but his chronic tardiness appears to be related to psychological symptoms:

> ALJ:  How come you're always so late?
> PLTF: . . . I think it's some kind of psychological thing, because it's been going on so long.

(Tr. 37).

> ATTY: What are doing in the morning before a job that makes you tardy?
> PLTF: In think mainly – I don't know.  I do the normal things that anyone else would do.  Brush my teeth, wash my face, brush my hair.  Get my clothes on.  Have breakfast.  But for some reason, I can't seem to synchronize myself with the time I'm supposed to be at work.  It never works.  I've tried.  I've been yelled at.  I've broken down in tears because my boss yelled at me so much about being late . . .
> ATTY: Does [Mom] complain about the amount of time that take use [sic] to shower, brush your—
> PLTF: Yes, she does, I'm always late . . .
> I—the only thing I can think of is I like to take my time.  I brush the front and back of my teeth.  I brush my tongue.  I make sure I get every speck of dirt gone.  I wash my face. . .
> ATTY: You told [MPC] or they believed that you were afraid of having too many germs.  You were, they said, obsessed with having germs on you.  Do you agree with that?
> PLTF: Yes.
> ATTY: Do you still have that problem?
> PLTF: Yes

ATTY: You think that's why it takes you so long to get ready in the
          morning?
PLTF: I think so, yes.

(Tr. 41-43).

## PROCEDURAL HISTORY

On March 11, 2010, Plaintiff filed an application for SSI, which was initially denied.  On

May 12, 2010, Plaintiff filed a timely Request for Hearing by Administrative Law Judge (ALJ),

and on February 3, 2011, a hearing was held before the Honorable Bradley Hanan.  The ALJ

issued an unfavorable decision dated March 25, 2011.  On April 18, 2011, Plaintiff filed a

Request for Review of Hearing Decision/Order with Defendant agency's Appeals Council and,

as indicated above, submitted additional evidence from PsychCare Consultants and Dr. El-

Mashhady.  After considering the additional evidence, the Appeals Council denied Plaintiff's

Request for Review on September 16, 2011.  Accordingly, Plaintiff has exhausted all

administrative remedies, and the decision of the ALJ stands as the final decision of the

Commissioner of the Social Security Administration.

## STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act (the "Act") defines as disabled a person who is "unable to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months."   42 U.S.C.

§ 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment

must be "of such severity that [the claimant] is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy, regardless of whether such work

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R.§ 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's

13

RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ in this case determined at Step One that Plaintiff has not performed substantial gainful activity since the application date of March 11, 2010.  At Step Two, the ALJ found Plaintiff's severe impairment was schizophrenia. At Step Three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Prior to Step Four, the ALJ found Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, "but with the following non-exertional limitations: he can perform only simple, routine and repetitive tasks in a low stress job defined as having only occasional decision-making requirements and changes in work setting occurring.  He is to have no interaction with the public, and only casual and infrequent contact with co-workers."  (Tr. 16-17).  At Step Four, the ALJ found Plaintiff has no past relevant work because "the earnings were not at the substantial gainful activity level."  (Tr. 19). At Step Five, the ALJ found there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

Plaintiff argues the ALJ's decision is not supported by substantial evidence, first, because the ALJ failed to properly consider whether Plaintiff's "failure" to comply with prescribed treatment was justifiable as required under SSR 82-59.   Plaintiff next contends the hearing decision failed to consider Plaintiff's other medically determinable impairments, namely major depressive disorder (MDD) and obsessive-compulsive disorder (OCD), which were diagnosed by Dr. Kamat.   Finally, Plaintiff argues that in determining Plaintiff's RFC, the ALJ failed to properly consider the opinion evidence that was before him; namely, the opinions of Dr. Moreno, the state agency psychologist.

## DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"   *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).   "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'"   *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).   In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision.   *Id.*   However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"   *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)). The court should disturb the administrative decision only if it falls outside the available "zone of choice" of conclusions that a reasonable fact finder could have reached. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006).

### B. IN DETERMINING PLAINTIFF'S RFC, THE ALJ FAILED TO PROPERLY CONSIDER TREATMENT COMPLIANCE AS REQUIRED BY SOCIAL SECURITY RULING (SSR) 82-59.

Prior to Step Four of the disability analysis, the ALJ is required to determine Plaintiff's residual functional capacity (RFC). The RFC is defined as what the Plaintiff can do, despite his limitations, and it includes an assessment of physical abilities and mental impairments. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). As part of the RFC determination, the ALJ must evaluate Plaintiff's credibility as required under *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). The ALJ is not required to discuss each of the *Polaski* factors in relation to Plaintiff, and he is entitled to discount Plaintiff's complaints if they are inconsistent with the evidence as a whole. *See Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). The court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

The ALJ in this case determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but was limited to only "simple, routine and repetitive tasks" in a

"low stress job" defined as having only "occasional decision-making requirements"' "occasional changes in work setting"; "no interaction with the public; and only casual and infrequent contact with co-workers."   (Tr. 16-17).   In assessing the severity of Plaintiff's symptoms, the ALJ generally found that Plaintiff's "medically determinable impairment could reasonably be expected to produce some of the alleged symptoms, but . . . the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 18).  In further support of his RFC determination, the ALJ stated:

> Although reluctant to take medication, [Plaintiff] admitted that his symptoms diminished with use.  His medicines were adjusted and changed periodically.  He frequently stopped taking medicine at his own volition.  In June 2010, he wanted his medications changed and reduced as much as possible.  He again stopped taking his medicine in September.  The claimant's medical records show that he did not keep medical appointments.  He stopped taking his medication, usually because he felt good and did not feel the need to take it any longer.  ***It can be assumed that the treating physicians would not have prescribed medications if there were a physical or emotional impairment that would have precluded the claimant from following the advice given***.
>
> . . .
>
> There were a number of inconsistencies in the record, which do not enhance the claimant's credibility. . . .   The record includes no psychiatric treatment or counseling for more than a year [approximately July 2008 to February 2010].  The lack of such evidence is not consistent with the claimant's allegations of disabling symptoms and impairments.  The lack of medical records documenting treatment during such period seriously undermines his credibility regarding ongoing mental impairments imposing severe symptoms and limitations of function.   It is significant that the claimant has not sought or received treatment for alleged symptoms.

(Tr. 18-19) (emphasis added).

Plaintiff contends the ALJ erroneously failed to consider Social Security Ruling (SSR) 82-59, which requires the ALJ to determine whether Plaintiff had "good reason" for his failure to follow a prescribed course of treatment.  *See* Pl.'s Br. at 7.  SSR 82-59 interprets the regulations pertaining to a failure to follow prescribed treatment.  Such policy interpretations are intended to

be binding on the Social Security Administration and must be given deference by the courts. *Newton v. Chater,* 92 F.3d 688, 693 (8th Cir. 1996).  For SSR 82-59 to apply, the claimant must first be found disabled without the prescribed treatment.  *Holley v. Massanari,* 253 F.3d 1088, 1092 (8th Cir. 2001).

Notwithstanding the Commissioner's arguments to the contrary, I find that, as the record currently stands, the bulk of the evidence in this case supports a finding that Plaintiff is disabled without medication.  For example, the record shows that Plaintiff's symptoms of paranoia date back to the age of sixteen, when he was still in high school.  By the ALJ's own estimation, Plaintiff has never been able to maintain employment at the level of substantial gainful activity. Although the ALJ stated that Plaintiff's inability to remain employed resulted from chronic tardiness, and not any psychological impairment, that statement is not supported by substantial evidence.   Plaintiff's unrefuted explanation for his chronic tardiness demonstrates that his chronic tardiness is tied to his psychological symptoms.  In addition, when Plaintiff was first diagnosed with schizophrenia in 2007, the attending psychiatrist at Barnes-Jewish Hospital found that Plaintiff "has significant loss of function and is unable to maintain a job or have friends" because of his current symptoms.  (Tr. 227).  As the Commissioner points out, there is certainly evidence suggesting Plaintiff may have been able to function for some time without his medication.  However, the evidence uniformly shows a return and/or exacerbation of symptoms when Plaintiff discontinued the prescribed course of treatment.

As written, the ALJ's opinion suggests that the ALJ similarly concluded that Plaintiff would be disabled absent medication.  The ALJ wrote:

> The record shows that, ***while he is compliant with his medications***, the claimant is functional to the degree indicated in the residual functional capacity . . . ***The episodes where he needed treatment were during periods when he was not***

18

> ***taking his medication***, and, at times, using marijuana although he testified he had
> ceased using marijuana in 2006.  He reportedly did well on medication.

(Tr. 19) (emphasis added).

Because there is substantial evidence in the record that Plaintiff would be disabled without medication, the ALJ erred by failing to consider and apply SSR 82-59.

In assessing Plaintiff's credibility, the ALJ "***assumed*** that the treating physicians would not have prescribed medications if there were a physical or emotional impairment that would have precluded the [Plaintiff] from following the advice given."  (Tr. 18).  The ALJ cited no authority or source for his assumption, and a review of the record reveals no such support.  This assumption implies that the ALJ concluded Plaintiff's medical non-compliance is attributable solely to his free will and, therefore, was not justifiable.  However, as Plaintiff points out in his brief, there are multiple instances in the record where physicians treating Plaintiff found he did not possess the insight to know he needed treatment.  *See* Pl.'s Br. at 8 (citing several examples in the administrative record).  Because the ALJ predicated his assessment of Plaintiff's credibility primarily on his assumption that Plaintiff's non-compliance was solely the result of his free will, the ALJ's credibility assessment is not supported by substantial evidence.

The Eighth Circuit has recognized that psychological and emotional difficulties may deprive a claimant of the "rationality to decide whether to continue treatment or medication." *Pates-Fire v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (quotation marks omitted).  Moreover, the Eighth Circuit has recognized that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse."  *Id.*  (alterations and citations omitted).  Accordingly, the ALJ must determine whether Plaintiff's noncompliance is willful or a medically determinable symptom of his mental impairments.  *Id.*  Failure to make this critical

distinction, despite evidence in the record supporting involuntary noncompliance, requires remand.  *See id.; see also Sharp v. Bowen,* 705 F. Supp. 1111, 1124 (W.D. Pa. 1989) (To determine whether a claimant with a mental impairment reasonably refused treatment, the ALJ should consider whether the plaintiff "justifiably refused in light of his psychological, social or other individual circumstances," because "[a]n individual with a severe mental impairment quite likely lacks the capacity to be 'reasonable.'").  Moreover, in cases involving plaintiffs with mental impairments, "'justifiable cause' must be given a more lenient, subjective definition." *Benedict v. Heckler,* 593 F. Supp. 755, 761 (E.D.N.Y. 1984).

As Plaintiff correctly points out in his brief, in the absence of any substantiating evidence that Plaintiff had the free will to comply with the prescribed course of treatment, the assumption made by the ALJ is tantamount to "playing doctor," a practice expressly forbidden by the Eighth Circuit.  *See* Pl.'s Br. at 9; *Pates-Fire*, 564 F.3d at 946-947.  In sum, the ALJ's failure to obtain medical evidence regarding the effect of Plaintiff's mental impairments on his ability to remain compliant with his medication requires remand.  On remand, the ALJ shall obtain, and consider, evidence to determine the cause of Plaintiff's noncompliance.

Because I find that remand is necessary on the issue of Plaintiff's non-compliance, it is not necessary to address Plaintiff's remaining arguments at this time.

## CONCLUSION

For all of the foregoing reasons, the court finds that this matter should be reversed and remanded to the Commissioner for further consideration consistent with this memorandum opinion.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED AND REMANDED** for further proceedings consistent with this Memorandum Opinion, pursuant to the fourth sentence of 42 U.S.C. § 405(g).

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of March, 2013.